MICHAEL R. TODD, Appellant, *v.* MUTUAL FACTORS, INC., Respondent, et al., Defendant.

First Department, April 30, 1957.

538

*Arthur Levine* of counsel (*Michael R. Todd,* in person, attorney), for Michael R. Todd, appellant.

*Robert Rubinger* of counsel (*Maurice Rubinger* with him on the brief; *Underhill & Rubinger,* attorneys), for respondent.

BERGAN, J.  This is an action by a lawyer to enforce his statutory lien against the assignee of his client.  The services were performed for Erie Basin Iron Works, Inc., now in bankruptcy, in connection with claims against the United States Government. Erie had been engaged in marine repair and construction work and had performed work under contract with the Navy on the naval ship *Greenville Victory.*

A dispute between the Navy and the contractor arose in 1952 and plaintiff was retained by Erie to represent it in departmental proceedings in the Navy in the prosecution of its claims under its contract.  Some 40 claims were involved in these departmental proceedings which totalled $65,000 and which were instituted by plaintiff in November, 1952 and were concluded in December, 1953.

As a result of the proceedings taken in accordance with Navy Department regulations, additional payments to Erie were authorized by the Navy in the sum of $20,625.  Plaintiff's fee for services in accordance with his agreement with Erie has been established in the sum of $5,438.72.

The statute (Judiciary Law, § 475) in terms creates a lien in favor of an attorney " who appears for a party " in a " proceeding  *  *  *  before any  *  *  *  federal department ". The lien thus created is upon the client's claim and " attaches to " a determination or decision in his client's favor " and the proceeds thereof in whatever hands they may come ".

It is established in this record, and, indeed, not factually disputed, that plaintiff prepared some 40 claims for presentation to the naval contracting officer. It is a sufficient generalization of these claims to say of them that they arose over interpretations of the specification of work done on the *Greenville Victory* and as to whether some items of the work were within or without the specifications set up by the Navy.

Under naval regulations, the record shows, the contracting officer is authorized to hear initially disputes of this character. Plaintiff represented Erie as attorney in two hearings before this naval officer on December 5 and December 12, 1952.

At the second hearing the contracting officer suggested the reduction of the claims to writing and these claims were prepared by plaintiff and filed with the contracting officer on December 16. As thus prepared in writing, the claims were reduced to 32 in number. On January 9, 1953, the contracting officer made a decision allowing nine of the claims thus presented in the sum of $10,772. Plaintiff then prepared on January 14 a letter of acceptance by Erie of the favorable part of the decision and noting a reservation of the right to appeal as to the rest.

Plaintiff then prepared an appeal to the Contract Advisory Board in Washington which is the official agency set up under naval regulations in contract disputes. His testimony is that the preparation of the appeal document which involved 18 claims occupied three weeks of the time of himself and his office assistant in February, 1953. The appeal document contains specifications in detail and consists of some 28 pages of closely typewritten material. This was filed in March, 1953 with the Contract Advisory Board in Washington.

Upon this appeal, a hearing was held by the Contract Advisory Board at which plaintiff appeared as attorney for Erie on September 18. This appearance was noted on the record before the board as it had been in the earlier hearings before the contracting officer in Brooklyn. As a result of the hearings before the board in Washington, two claims were allowed immediately and by a formal decision of November 20, the board allowed eight additional claims, totaling on their face $11,870.

Findings of fact were made and this determination was transmitted to Erie in a letter from the Navy Department on December 3. The precise amount of some of the items was remanded to the naval contracting officer for equitable adjustment and following further conferences with the contracting officer at which plaintiff did not personally appear, these adjustments

were made and the amount due as adjusted was fixed at $9,088 which was paid. A reservation was made as to an additional claim which is not here in issue.

It was the practice of Erie to assign its invoices with its factor, the defendant Mutual Factors, Inc., when it became assured that the Navy would pay the invoice. Although Erie is named as a defendant, the claim against it is not pursued in view of the proceedings in bankruptcy and for convenience we refer to Mutual as the defendant. After the allowance of the claims before the contracting officer in January, 1953, after the allowance by the Contract Advisory Board of two items during the hearing, and after the decision of November 20, 1953, of the board, Erie at once assigned the invoices to Mutual which thereafter received the proceeds. Plaintiff testified he did not know of these assignments by Erie and had expected his client to pay him and had requested payment.

Plaintiff's services come literally within the scope of the Judiciary Law definitions setting up an attorney's lien. He appeared for a party in a proceeding before a " federal department," a term which embraces the proceedings before the contracting officer and before the Contract Advisory Board. There were decisions in his client's favor pursuant to which " proceeds " were payable to his client and were paid on his client's order. The statutory lien thus attached both to the decision and to the proceeds that were paid to defendant Mutual.

We would agree readily that the character of " proceeds " of a favorable decision of a judicial or administrative body might be transmuted so that the lien could be lost. Cash which a client received and transmitted in turn to a third party might lose the impress of the lien, notwithstanding the words of the statute extending the lien on proceeds " in whatever hands they may come ", and the farther away the proceeds went from the source the more they might lose identity.

But " proceeds ", as used in the statute, do not lose their character as the product of lawyer's work resulting in a Federal administrative determination when they go directly from the Government to the recipient. In this close relationship they continue to be proceeds of the public proceeding; and while they thus continue to be clearly identifiable as the product of a determination of a judicial or administrative tribunal, the statute is clear in establishing the public policy that the lien follows the proceeds " in whatever hands they may come."

It would not be doubted if a successful party assigned the judgment of a court, and a levy were made by the Sheriff to satisfy it, that the assignee would take the proceeds from the

Sheriff subject to the attorney's lien for services in the action, even though he gave value for the assignment and believed that there was no lien for services. While the subject matter of the lawyer's work remains as an intact identity, there is a clearly stated legislative intent that it comes directly from the litigated process into the hands of assignees or other third parties with the stamp of the lien attached.

How far it must go in the process of assimilation to lose the lien is not a necessary part of decision in the case before us. Here the proceeds of the work went straight from the Federal agency before which the lawyer appeared into the hands of the assignee; it is sufficient to hold that in such a close process the lien was not lost.

This result would follow from the words of the statute read literally, without necessarily also reading them liberally. The existence of a lien to which this literal reading of the statute leads is given firmer foundation if the statute is also read liberally; and the course of its judicial construction suggests a liberal reading. The statutory provision that the lien of an attorney attaches to a decision in his client's favor " and the proceeds thereof in whatever hands they may come " stems from an amendment of section 66 to the Code of Civil Procedure (L. 1879, ch. 542).

In the careful demonstration of the history of the development in New York of the attorney's lien by Judge VANN in *Fischer-Hansen* v. *Brooklyn Heights R. R. Co.* (173 N. Y. 492, 497) it was intimated that the 1879 amendment was in response to a decision of the court in *Coughlin* v. *New York Cent. & Hudson Riv. R. R. Co.* (71 N. Y. 443), in which it was held that since the cause of action there was not assignable the party could not by agreement with his lawyer give him an interest therein before judgment and that the settlement made directly between the client and the adverse party barred the action notwithstanding an agreement with the client that the lawyer would for his services have a share of the recovery.

Judge VANN noted in respect of this and other amendments a consistent direction of statutory progress toward " protecting members of the bar " (p. 495; see, also, p. 498), and that the statute, as it then [1902] stood, " in its most important part ", gave an attorney a lien not only attaching to the decision but also " to the proceeds thereof, so that it cannot be affected by a settlement made between the parties at any stage ". (P. 498.)

Although the statute had its genesis in experience with transactions by which the fees of the lawyer were defeated by

concurrence between the client and the adverse party in the litigation, it is clear from the decisions which immediately followed the enactment of the amendment of 1879 as well as from the statutory text itself, that when such a lien exists within the frame of the statute, it cannot be defeated by direct assignment of the proceeds of litigation from the client to a third-party assignee, and that the lawyer may follow his lien against the proceeds in the hands of such an assignee.

As CLARK, J., noted in *Matter of Swartz* v. *City of Utica* (223 App. Div. 506, affd. 254 N. Y. 555), the statutory lien protecting a lawyer's work should receive both a reasonable construction and one which will liberally give scope to "its beneficial purposes"; and these ought not be defeated "through technicalities or a strained construction". (P. 509.) This liberal approach to the statute creating the lien has been quite consistent. See, for example, *Barry* v. *Third Ave. R. R. Co.* (87 App. Div. 543).

Circumstances could, of course, combine to make it oppressive or unjust to enforce such a statutory lien; but this is not such a case. Defendant not only received direct and substantial benefits from plaintiff's professional work in the recoupment of its loans; but it was so closely related to the whole process and followed up its interests in such detail that it is not easy to accept its argument that it did not know the underlying processes by which payments from the Navy were effected.

During the time at issue here, John Alesi was president of the Erie corporation and conducted the financial transactions with the defendant as factor. He testified to the procedures followed. The usual practice was to show defendant the job order of the Navy Department and "upon completion of the job, we assigned to them the invoices which we rendered to the Department of the Navy". It was the practice of Harry C. Levinson, president of defendant, to "require" that he see the completion certificate "or some document to satisfy himself that the job was satisfactorily completed."

Mr. Alesi testified, for example, that he personally brought to Mr. Levinson at defendant's office the invoice for $10,772 of January 15, 1953; on the strength of which the defendant on the following day advanced to Erie by its check for $8,402.16, 80% of the face of the invoice, less 2% commission. Mr. Alesi signed a certificate on the invoice that "the above bill is correct and just" and a further certificate that "This invoice is assigned to Mutual Factors * * * Pay all proceeds to Mutual Factors."

On the face of the invoice thus assigned to defendant are two significant statements. One is that the job order pursuant to which the invoice was issued was "negotiated" and the second, and more important, is that it is for "claims allowed as per letter dated January 9, 1953 and signed by Captain M. P. Kingsley, USN Contracting Officer."

The letter thus referred to set up in detail some 32 disputed or controverted claims arising from the work on the *Greenville Victory*. It indicated with precision which claims were allowed in full or in part; and which were disallowed. Mr. Alesi testified "I brought documents supporting those invoices, such as the letter from Captain Kingsley, allowing these claims which this invoice represents" to Mr. Levinson.

He testified that Mr. Levinson had asked him about the claims that had been disallowed by the Navy and he had replied "that Mr. Todd told me to put in letter form that this would not waive our rights as to appealing the balance". Mr. Alesi further testified that Mr. Levinson had followed this up by asking him on several occasions as to "progress of the preparation of the balance" of the claims.

The "appeal" of Erie to the Naval Contract Advisory Board in Washington "from the rulings" of the contracting officer at Brooklyn "rejecting certain claims" in connection with work on the *Greenville Victory* was dated March 5, 1953; was prepared by plaintiff; was fully documented in respect of each item, and included 28 typewritten pages of specifications.

Mr. Alesi's testimony is that he told Mr. Levinson "that Mr. Todd had completed the preparation of the appeal and that it was on its way to Washington". Mr. Alesi testified that Mr. Levinson had asked to see the document; that it had been sent to him; and that when it was returned Mr. Levinson commented "that it was very well prepared". The testimony of Erie's office manager, Joseph Tulich, corroborates Mr. Alesi's testimony on the knowledge brought home to defendant that plaintiff had prepared and taken the appeal to the Navy Department.

The only witness for defendant was Mr. Levinson himself. He was asked whether, when the January 15, 1953 invoice for $10,772 was presented to him containing the reference to the letter of Captain Kingsley of January 9, he made the payment of 80% "merely on the strength of the invoice". To this he replied that "they had a letter from Captain Kingsley, authorizing them to submit these nine items and they would be paid". This is the letter dealing with accepted and rejected items to which we have referred.

We turn from this to a matter of prime factual importance in this action. After plaintiff had presented Erie's appeal to the Naval Contract Advisory Board in Washington a formal determination was made by the board in which findings of fact and decisions on disputed issues were rendered. The decision of the board in due form contained the title, i.e. "Appeal of Erie Basin Iron Works, Inc." and an entry of appearances on both sides, including that of "Mr. Michael R. Todd, attorney" for Erie.

It contained some 16 pages of findings and was transmitted to Erie with a letter from the counsel of the Military Sea Transportation Service dated December 3, 1953, which noted that as to some of the claims decided "there has been a remand to the Contracting Officer with instructions to make equitable adjustment". This letter also stated that a copy of the letter " has been sent to the Contracting Officer and to your attorney, Mr. Michael R. Todd ".

The following day, December 4, 1953, Erie issued a new invoice of $11,870 for eight items allowed on appeal, which was assigned to defendant December 7. This invoice referred to " additional claims allowed ". It was not accepted on its face by the naval authorities because the remand to the contracting officer " to make equitable adjustment " had not been cleared through the contracting officer; and Erie thereupon proceeded to undertake this adjustment.

In this process the defendant's president, Mr. Levinson, according to his own testimony, took up a direct and personal participation. The adjustment made was for $9,088 instead of $11,870. He testified: " I was the one who was down at the base when the dispute came in between the $11,870 and the $9,088. They allowed the items, but not the amounts." This is an exact description of what the Contract Advisory Board had done on appeal.

Mr. Levinson's testimony continued: " The man in charge said, ' You will have to submit a new invoice,' and this is the breakdown for the $9,088." The witness said he was interested in why invoices involving other jobs were not paid, and among them those on the *Greenville Victory*; and that as to the $11,870 item " we found out why it was being held up." This, he said, was because the contracting officer would allow the eight items, but not the amounts, and could not allow $11,870. " Finally they agreed on the $9,088 and it was O.K. with me."

For this a new invoice was issued under date of December 22, for $9,088 which was assigned to defendant on the same day. Mr. Levinson testified that this was a substitute for the $11,870

invoice which it superseded. It was on this invoice of December 22 that the face amount was paid by the Navy to the defendant on January 12, 1954. This invoice plainly stated that it was for "claims allowed by the Contract Advisory Board, Military Sea Transportation Service * * * in letter dated December 3, 1953".

This is the letter which had enclosed the findings in which the appearance of plaintiff as attorney before the board had been recited and which letter itself referred to Mr. Todd as attorney in the proceeding. Besides this, at the end of the conference before the contracting officer in which Mr. Levinson took so active a part a formal agreement was entered into between Erie and the United States Government dated December 29, 1953, which settled the amount of the dispute for $9,088 and which specifically recited the prosecution of the appeal before the Contract Advisory Board; the allowance of the eight items which were included in this amount; and the remand to the contracting officer to effect an equitable adjustment. It was this final agreement closing the appeal proceedings which made possible the payment of the invoice for $9,088 to defendant on January 12.

There can be no doubt that Mr. Levinson examined the invoice of December 22 for $9,088 on which his corporation received payment as assignee. The record suggests he examined documents of this sort with care and his testimony frequently indicates this was his practice. At one point in his testimony on cross-examination he commented with respect to one of the documents upon which he was being examined that "The invoice speaks for itself."

The underlying documents to which the invoice of December 22 referred on its face would have shown the appearance of plaintiff as an attorney before the Federal agency in Erie's claim; the final agreement, resulting from the conference in which Mr. Levinson actively participated in looking toward an adjustment, would have indicated the prosecution of an appeal; and it seems incredible that he could have seen documents of a character disclosed in this record and have participated so actively and closely in the proceedings looking to an adjustment of the claims without adequate knowledge that plaintiff had, as a lawyer, prosecuted the appeal and taken the necessary other measures before the Federal administrative agency to have helped bring about the adjustment of the claims, the proceeds of which defendant received by direct assignment of plaintiff's client.

This conclusion seems quite inescapable when it is remembered that when Mr. Levinson saw the notation on the invoice of a year earlier, January 15, 1953, referring to a letter from Captain Kingsley as an underlying document, he acknowledged a complete acquaintance with the contents of this letter and described it as authorizing Erie " to submit these nine items and they would be paid ".

Plaintiff offered proof that the decision of the Contract Advisory Board and the letter of transmittal referring to plaintiff's appearance as a lawyer in the proceedings were shown to Sidney Gondelman, an officer of defendant, at the same time they were shown Mr. Levinson, and discussed with both of them. Mr. Gondelman was not called as a witness by defendant.

Except as to the proceeds of the payment of $9,088 from the Navy to the defendant on January 15, 1954, we find that plaintiff by long failing to assert his rights against the defendant assignee, waived them and is estopped from now enforcing these portions of his lien. This is especially true of the invoice of a year earlier (Jan. 15, 1953) for $10,772. Waiver is found also in respect of the payment of $765 on November 16, 1953; although that is a somewhat closer question.

The judgment should be modified to enforce plaintiff's lien for services on $9,088 paid to defendant January 15, 1954; and as thus modified, affirmed, with costs to appellant. Settle order.

BREITEL, J. (dissenting). I dissent and vote to affirm the judgment dismissing the complaint.

I am not without doubt whether the statutory charging lien of an attorney extends to the proceeds in the hands of a purchaser for value of an unlitigated claim, in the absence of actual notice of lien, as distinguished from mere knowledge that an attorney has rendered services in connection with procuring payment of the claim. Thus, in *Fischer-Hansen* v. *Brooklyn Heights R. R. Co.* (173 N. Y. 492, 501–502) it was said that " It [the lien] clings to any property or money into which the subject can be traced, until it reaches the hands of a *bona fide* purchaser." (Cf., also, 7 C. J. S., Attorney and Client, § 230; 5 Am. Jur., Attorneys at Law, §§ 225, 227, 230; Anno. 93 A. L. R. 685 *et seq.*; but see, *Matter of Lexow* v. *Tremaine*, 252 App. Div. 307, affd. 277 N. Y. 657.) But I do not find it necessary to reach that question.

The relationship among the three parties in this case was simple indeed. The attorney was handling claims on a written contingency arrangement for his client Iron Works. Iron Works

was factoring its accounts by assigning them to the factor Mutual Factors. The attorney knew at all times that Iron Works was factoring accounts. The factor at all times knew that the attorney was handling the claims for Iron Works before the Federal agency. The attorney, however, did not know whether any particular claim was assigned or not under the factoring agreement. The factor, on the other hand, did not know how the attorney was being paid for his services. The attorney never told the factor that he was not being paid and was relying for compensation on his contingency arrangement.

Only with respect to the third claim for $9,088.90, which was paid to the factor on January 15 or 20, 1954, is the attorney's lien sustained by this court. The lien on this claim is then sustained, evidently, on the basis that the attorney did not waive his lien because his demand for payment of his fees *from the factor* was made no appreciable lapse of time after the factor took the assignment or received payment. This third claim results from an invoice which was settled with the Federal agency on December 29, 1953. The claim covered an invoice dated December 22, 1953 and was assigned on that date to the factor. The factor received payment, as pointed out earlier, on January 15 or 20, 1954. The attorney made his demand for his fees from the factor on January 22, 1954. But, if the attorney waived his liens on the earlier claims, by his silence, while permitting the factor, with whom he was in contact, to take assignments of the claims, surely the effect of his conduct projected itself into the future, unless and until he should give notice to the factor that it was taking assignments of claims prosecuted by him at its peril.

From at least January, or March, 1953, the attorney knew that payments were being made on the earlier claims and he was not receiving his share of the proceeds from the client or anyone else. Instead of giving notice or suing, although in contact with the factor, he remained silent, because he wished, as he said, in effect, to maintain his relations with his client. He changed his attitude only after the client, Iron Works, faced bankruptcy. In the meantime, however, the factor had parted with cash given to Iron Works in purchase of the claims, and had not even retained its 20% reserve under the factoring arrangement.

This course of conduct is the very stuff of waiver and estoppel (31 C. J. S., Estoppel, § 87 *et seq.*), and its effect would not be changed until the attorney brought home to the factor what were

the circumstances, and what were the attorney's claimed rights. This was not done until the factor's position had been hopelessly changed. (Cf. *Matter of McCrory Stores Corp.*, 19 F. Supp. 691; cf., also, *West v. Bacon*, 164 N. Y. 425.)

All of this is in the evidence of the case — virtually undisputed — and the trial court properly found that the attorney's conduct constituted a waiver and an estoppel as against the assignee, whatever it might be as between attorney and client.

PECK, P. J., BOTEIN and VALENTE, JJ., concur with BERGAN, J.; BREITEL, J., dissents and votes to affirm the judgment dismissing the complaint in opinion.

Judgment modified so as to enforce plaintiff's lien for services on $9,088 paid to defendant January 15, 1954 and, as so modified, affirmed, with costs to the appellant. Settle order on notice.